[Civ. No. 13987. First Dist., Div. One. Aug. 16, 1949.]

CARL WEBER et al., Respondents, v. MARINE COOKS'
AND STEWARDS' ASSOCIATION OF THE PACIFIC
COAST (an Unincorporated Association) et al., Appel-
lants.

Gladstein, Andersen, Resner & Sawyer, Richard Gladstein and Norman Leonard for Appellants.

Aaron Sapiro and G. C. Ringole for Respondents.

WARD, J.—This is an action for declaratory relief involving the status of the constitution and by-laws of defendant labor union, an unincorporated association. The complaint was filed by a group of members of the Marine Cooks' and Stewards' Association of the Pacific Coast, sometimes known as the National Union of Marine Cooks and Stewards, on behalf of all of the members who chose to join with them.

The trial court found that in the attempted adoption of the new constitution the association did not comply with the provisions of the original and controlling constitution. The first constitution may be referred to herein as Exhibit "A" or "A," and the second as Exhibit "B" or "B."

The complaint alleges that defendants purport to operate under an amended constitution by which the association name was changed. The officers remained practically the same. Exhibit "A" provides: "This Constitution may be amended in the following manner: Any member in good standing may, in any regular meeting, introduce any amendment, which shall be read, placed in the minutes of said meeting, and be laid over two weeks, awaiting amendments if accepted by the meeting at which introduced and by Headquarters. It shall then be voted on by a referendum ballot for six (6) consecutive weeks, and if it contains a majority vote it shall be declared adopted."

The complaint further alleges that at a regular meeting of the association a proposal was presented concerning the biennial holding of a general convention of delegates elected from ship and shore by general vote, "That at the said meeting, it was moved and seconded that the meeting concur with the foregoing resolution and that it be laid on the table for two (2) weeks for further amendment; and this motion was then amended to the effect that the matter be referred to a Constitutional Convention and upon vote, the said amendment was carried." The complaint also alleges that "a purported convention was held" and a new constitution presented.

Paragraph IX of the complaint lists the important points of difference between "A" and "B." In substance as alleged they are: (a) a reduction in time within which probationary members may become full members; (b) creation of a "General Council" under which all authority and power of the union between conventions is transferred to said "General Council"; (c) a removal of the limitation that officers of the union be American citizens; (d) a transfer of control of expenditures from the membership to the "General Council"; (e) a transfer of control of salaries and expense accounts of officers from the membership to the "General Council." Subparagraph (f) sets forth, "The primary difference between the constitution, Exhibit 'A,' and the proposed constitution, Exhibit 'B,' is that the original constitution, Exhibit 'A,' retains all the power and control of the Union in the membership, with a democratic process for determin-

ing the policies and affairs of the Association; whereas, the provisions of Exhibit 'B' permit the control of the Association (or the Union) by a small committee of officers, without the democratic control by the membership; and that this control by a small Council of officers is particularly harmful to an Association like Defendant Association, where the vast majority of members are away at Sea at all times and are not able to participate directly in the immediate meetings of the Association." In further paragraphs of the complaint other violations of "A" are alleged and attorney's fees are requested, as is the appointment of a receiver to conduct the affairs of the union until new officers shall be elected under the provisions of "A."

The answer alleges lack of jurisdiction of the court; incapacity of the plaintiffs to bring the action; laches; and that since November 1, 1945, "the said Union has been governed by a new constitution duly and regularly adopted" and that "B" superseded "A." It denies that the two constitutions differ in important respects; admits that the probationary period for membership in the union is reduced from one year to six months; admits the creation of a "General Council" which is alleged to be somewhat the same as a former "Agents' Council" and that the acts of the "General Council" are subject to the approval or disapproval of the membership of the union; admits that under "B" American citizenship is not required in order to hold office in the union but alleges the change is for the benefit of the union; alleges that "control by the membership over the General Council, including the manner in which any expenditures of funds are made, is under the new constitution so great and substantial that it includes the right and opportunity for the membership to institute a recall against any member of the General Council upon the filing of a petition signed by 100 members, whereas the membership of the Union is approximately 15,000"; alleges that while under "A" it was provided that salaries and expense accounts of officers should be fixed "as the Union should determine," "B" provided that the general council may determine salaries and expense accounts of elected officers subject to the subsequent "approval of a majority of the membership voting at the port meetings" and thus no change has occurred in the control of such remuneration; and "that a referendum ballot on the matter of accepting the new constitution was conducted among the rank and file

membership of the Union, and that the members of the Union did cast ballots thereon.''

For a separate defense the history of the organization is set forth. It is alleged that the chief committee at the convention held in San Francisco in July, 1945, was the committee on the constitution. ''The official vote on the (new) constitution was 75 in favor of adoption, six against adoption, and one abstaining . . . During the entire month of August, 1945, and the first two weeks of September, 1945, opportunity for discussion and consideration of the forthcoming referendum vote was given. Also during this period throughout August and the first two weeks of September, 1945, in issues of the Union's official newspaper, notices were carried of the forthcoming vote upon the constitution and the general tenor of all articles and notices was to the effect that the widest possible vote without prejudice was being sought.'' The answer alleges that the vote was by secret referendum ballot and the result of the referendum was that an overwhelming majority of the members voted in favor of adopting the new constitution. The answer further alleges that the union through its general council donated certain funds and sent a representative as a delegate to a convention ''fighting against racial discrimination,'' and that the membership subsequently approved the action of the general council.

It is not necessary to narrate in detail the evidence covering 953 pages of the reporter's transcript. The findings, except in a few instances, which will be mentioned when material, are supported by the evidence. The court found that plaintiffs were members of defendant association of approximately 15,000 members, all of whom have a joint ownership interest in this action; that it is proper to bring this action on behalf of all who choose to join with plaintiffs on behalf of the unincorporated association, which is a labor union; and that the ''National Union of Marine Cooks and Stewards is the same organization'' as the ''defendant Association.''

The court found that the constitution (''A'') provides for amendments as alleged in the complaint. The court further found that defendants failed to take steps required by constitution ''A'' for amending such constitution and ''that they, in particular, failed to introduce the said constitution, Exhibit 'B,' at a regular meeting of the members; and that the said officers and the said defendant Association likewise failed to read the said Constitution, Exhibit 'B,' at the said

legal meeting or at any legal meeting of members; and that the said officers and said Association failed to place the said Constitution, Exhibit 'B,' in the minutes of any meeting of the members of said Association; and that the said officers and said Association failed to lay over the resolution containing the said Constitution, Exhibit 'B,' for two weeks, awaiting amendments, all as provided in Article XXI of the original constitution, Exhibit 'A,' herein''; that a referendum ballot was taken but was not conducted in accordance with the provisions of ''A'' covering balloting and the duties of the ''Balloting Committee'' and the ''Ballot Counting Committee.''

It was found that the association was operating under a new name with the new constitution as a guide, but business was conducted with the funds, amounting to approximately $600,000, of the original association, ''and that these plaintiffs and the members represented by these plaintiffs have a substantial interest in the said funds and properties of the Association and in the privileges and rights pertaining to them as members of the said Association, which funds and properties are now being improperly administered and expended by defendants, under the purported new Constitution, Exhibit 'B' herein.'' The court also found that ''a dispute and actual controversy has arisen between plaintiffs and defendants with respect to the said document, Exhibit 'A,' and the said document, Exhibit 'B,' herein, and the rights, responsibilities, duties and legal obligations of the parties herein under the said documents.''

The following conclusions of law should be mentioned: ''That all the activities and expenditures of the defendant Association and the defendant officers, conducted in accordance with the proposed Constitution, Exhibit 'B,' and contrary to the terms of the original constitution, Exhibit 'A,' have not been duly authorized and were made in violation of the provisions of the constitution and by-laws of the association. . . . That the plaintiffs have shown due diligence in filing the complaint herein, and that there is no laches on the part of the plaintiffs or any of them.'' Judgment followed in accordance with the findings of fact and the conclusions of law.

It appears that in 1941 a constitutional convention had been mentioned. The evidence shows that at a conference of the port agents in the fall of 1944 the administrative

heads of the branches of the association in various cities considered the matter of a constitutional convention to be held in 1945. One of the officers of defendant association identified a copy of "Voice," the union's publication, dated October 6, 1944, which contained a sample ballot sent to the members of the union. This ballot read in part, "This vote to be taken at headquarters and the branches starting October 5, 1944 and concluding October 20, 1944. Balloting should be for two (2) weeks, Monday through Friday of each week." The balloting period was not six weeks, as required by "A" for a referendum on amendments to the constitution. The results of the balloting are not the subject of dispute. Seven hundred and twenty-nine voted for and 228 members voted against the calling of the convention. The vote was approximately 10 per cent of the total membership of 15,000, many of the members being out at sea and unable to vote.

Defendants' main grounds of appeal may be stated as follows: that the old constitution did not provide for its own repeal or for the adoption of a new constitution and that the members of the union were privileged to utilize any fair or reasonable method to adopt a new constitution; that irregularities of a procedural nature may be disregarded if there is a substantial compliance with justice and fair play; that the members of the union had the authority as a fundamental right to adopt any constitution they might choose for its government "irrespective of the provisions of the pre-existing constitution."

■ An association operating under the provisions of a contract in the form of a constitution and by-laws does not have the fundamental right to choose a new constitution "irrespective of the provisions of the pre-existing constitution" upon the sole ground that the old constitution does not have a special provision for "repeal" if there are provisions directing the method by which the old may be made into a new controlling contract. ■ It may be true that a broad construction could be invoked when only irregularities of a procedural nature appear and it is plain that the change is in accordance with justice to all of the members, but when a change is made in the disposition of funds, the property of the association, which in turn the members own, then a loose procedure in adoption should not be upheld.

■ The contractual relation between a voluntary association such as a labor union and its members is based upon the constitution and the by-laws of the association. (*Smether-*

*ham* v. *Laundry Workers' Union,* 44 Cal.App.2d 131 [111 P. 2d 948].) In *Bush* v. *International Alliance,* 55 Cal.App.2d 357 [130 P.2d 788], there appears on page 364 the following quotation from *Dingwall* v. *Amalgamated Assn.,* 4 Cal.App. 565, 569 [88 P. 597]: ''The constitution, rules and by-laws of a voluntary unincorporated association constitute a contract between the association and its members, and the rights and duties of the members as between themselves and in their relation to the association, in all matters affecting its internal government and the management of its affairs, are measured by the terms of such constitution and by-laws.'' (See *Smith* v. *Kern County Medical Assn.,* 19 Cal.2d 263 [120 P.2d 874].) ▮ Until ''A'' has been repealed in accordance with its provisions, the rights and duties of the members must be measured by its terms. ▮ Accepting the doctrine that the constitution and by-laws of a voluntary unincorporated association constitute a contract between the association and its members, a novation in such contract may be attained only by the substitution of a new contract between the association and its members (Civ. Code, §§ 1531, 1532) either by abrogation or modification. In the present instance ''B'' purports merely to be a modification of ''A.'' The ''Proposed Constitution'' does not repeal ''A.'' There is a change in designation of title from ''Marine Cooks' and Stewards' Association of the Pacific Coast'' to ''National Union of Marine Cooks and Stewards.'' The date of the original organization in ''A'' and ''B'' is given as 1901. A marked similarity of intent and purpose is seen in the ''Foreword'' and ''Preamble'' of ''B'' when compared with the ''Preamble'' of ''A.'' Evidently the same ''Headquarters'' was retained. The membership under ''A'' automatically became the membership under ''B.'' There was no liquidation of the assets of the association under ''A''; they were just assumed to be the property under ''B.''

It is true that at the convention in 1945 a motion was made to delete the whole of the old constitution and substitute the new proposal. However, the convention went on record as recommending the concurrence of the union at a referendum ballot. The proposed constitution, ''B,'' was published in the organization's official publication and ''thereby distributed to the membership.'' Six weeks after the convention a referendum election commenced.

The provisions of ''B'' differ from those of ''A'' primarily, (1) by removing the limitation that officers be American citi-

zens, and (2) by transferring the control of expenditures. Discussion herein may be confined to the transfer of control of assets in the form of salaries and expenses from direct membership to the authority of a ''General Council'' subject to the approval of a majority of membership voting at port meetings. ''B'' provided that the administrative body of the union in the periods between conventions shall be the ''General Council.'' The ''General Council'' was to consist of the president, the vice president, the secretary-treasurer, and the port agents, but ''The highest governing body in this Union shall be the Convention, consisting of the members of the General Council and delegates elected from the Branches and the ships.'' (Art. 2, § 1 of ''B.'') The convention at which ''B'' was purportedly adopted consisted of approximately 90 delegates.

The convention purportedly adopted ''B,'' thereby changing the primary power of the members of the association to fix and expend certain funds, and giving such power to the ''General Council.'' ''A,'' in article XII, bestowed the power to fix the remuneration of officers ''from time to time'' in the union, and article XVII enumerated running expenses and further provided in section five of the same article that, ''No other than said running expenses shall be incurred unless so ordered by a ballot vote taken at Headquarters and Branches, of which at least a two-thirds majority must vote in the affirmative.'' In contrast, ''B'' provides, in article II, section 8, ''In addition to its general authority as the administrative body between conventions, the General Council shall have power to receive and act upon the reports of any of its members, to prepare, approve or modify the budget, and to formulate plans and take actions for the effectuation of the decisions and policies of the Convention.''

There is some evidence from which an inference may be drawn that at regular meetings the membership voted in favor of making certain ''donations.'' In some instances the record shows membership approval without notation of the vote. Proof concerning membership voting is silent on the question of a ''ballot vote'' as required by ''A.'' It is not necessary to enumerate the various donations made to persons and organizations as political contributions nor to determine in this case whether they are within or without union activities. There is evidence to sustain the court's finding that without ''proper authority . . . substantial funds belonging to this Association'' have been expended. In other words, not only

was there an attempt to change the provisions of the governing authority, the constitution, but an actual change in the disposal of funds became effective, which is important in determining the main issue, the validity of the method of amending the constitution.

 A constitution which maps a course to follow to change its terms may be held to be either directory or mandatory. Decisions holding each way are available and have been presented by the respective parties, but each case is a replica of justice applied to the facts of that particular situation. The facts of this case require that irregularities of a procedural character should not be disregarded. The rules of "A" could have been followed. It must be held that those rules were mandatory.

A referendum ballot on the matter of the acceptance of "B" was held some time subsequent to the convention, but the balloting was not conducted, as found by the court, in accordance with the provisions of sections 3 and 4 of article VI of "A." There is conflicting evidence as to the manner in which the balloting was conducted. Plaintiffs refer to certain pictures, introduced in evidence, which it is claimed are evidence that the balloting was not "secret." All five members of the balloting committee were not always in attendance. One of the officers testified that they were enlarging the office and thus were prevented from having the usual balloting arrangements. One witness testified that he voted on the balloting committee's table as there were no voting booths.

There is merit in plaintiffs' contention that the referendum vote on the holding of the convention of July 23, 1945, was neither a referendum for the election of delegates under "A" nor a referendum on the expenditure of funds for equipment or unusual expenses. Technically, "Headquarters" was required to set the length of the referendum vote at not less than six weeks. However, a more vital question is presented, namely,—was an attempt made to change the constitution so that a small body at a convention or a group designated as the "General Council" might map the course and policy of the association, particularly on the subject of the expenditure of funds, by expending and subsequently attempting to obtain approval by referendum to the membership, whereas under "A" the members should have the right to vote in advance of the adoption of new policies and the disposition of the funds by first calling a referendum addressed to the real owners of the funds?

Whether the requirements of "A" were satisfied presents both a factual and a legal issue. Factually the findings are supported by substantial evidence. ▮ As a matter of law, where a constitution of a voluntary association is amended the procedure prescribed therein should be followed in every requisite if the personal or property rights of the members are at stake. (*Schou* v. *Sotoyome Tribe, No. 12,* 140 Cal. 254 [73 P. 996]; *Stoica* v. *International etc. Employees,* 78 Cal. App.2d 533 [178 P.2d 21].) The findings of the trial court in this respect must be approved.

▮ In addition to other contentions, defendants urge that plaintiffs have no standing to complain and that there are remedies in the new constitution which offer adequate means to safeguard against any grievance. The answer to the last contention is that the so-called safeguards are built on an unsound foundation if "A" instead of "B" is the governing constitution. Plaintiffs could not be expected to cure the evil through the passage of measures under the provisions of "B," an invalid instrument.

▮ The objection that plaintiffs have no standing to complain includes the suggestion that plaintiffs have not exhausted their internal remedies. In *Simpson* v. *Salvation Army,* 49 Cal.App.2d 371 [121 P.2d 847], a limited exception was recognized. It was held that where an organization has violated its own laws and arbitrarily violated a member's property rights the rule of exhaustion of remedies by appeal to a higher body within the organization need not be adhered to before direct resort to a judicial tribunal. (See p. 375.)

In the closing brief some mention is made of laches. This point was raised by demurrer and answer. The court found that plaintiffs were not guilty of delay in filing the complaint. (*Maguire* v. *Hibernia S. & L. Soc.,* 23 Cal.2d 719 [146 P.2d 673, 151 A.L.R. 1062].) In addition, the court found, based on evidence in the record, "That it is true that plaintiffs have made efforts to correct the said violations of the Constitution, Exhibit 'A,' and have made protests against the said improper actions and steps taken as aforesaid by the said named defendants and the Association, defendant herein; and that the protests of plaintiffs were ignored; and that several of the said objecting members were expelled from the Association, defendant herein; and that plaintiff, Carl Weber, presented objections in writing to the defendant Association; and that plaintiffs, . . . orally and otherwise, objected to the illegal steps and proceedings followed by the said officers and Asso-

ciation, defendant herein; but that the defendant officers and the defendant Association refused to correct the aforesaid violations of the Constitution Exhibit 'A.' ''

If a controversy exists as in this proceeding and a complaining party is entitled to some relief a trial court may not refuse to declare the rights of the parties concerning the controversy. (*Lord* v. *Garland,* 27 Cal.2d 840 [168 P.2d 5].)

The purpose of the action is to set at rest or at least quiet, until the occurrence of further events, the rights and relations of the parties. (*Columbia Pictures Corp.* v. *DeToth,* 26 Cal.2d 753 [161 P.2d 217, 162 A.L.R. 747].) In this case the court found that a substantial injury had occurred to plaintiffs and others and rendered declaratory judgment on the controversial issues presented. This is an example of conditions wherein declaratory relief is applicable.

Plaintiffs argue that a receiver should have been appointed. Plaintiffs did not appeal from the order denying their application for a receiver and therefore the point may not be considered.

Defendants' purported appeal from the order denying their motion for a new trial should be dismissed. However, to the end that all of the facts may be presented, certain portions of the motion for new trial covering newly developed evidence will be recognized and considered on the motion to reopen the case, as the latter motion is reviewable on appeal from the judgment.

Defendants claim that the denial of the motion to reopen the record before formal findings, conclusions and judgment were entered was error. The purpose of undertaking or starting a new procedure of adoption of the constitution was to comply with the provisions of ''A.'' The main ground of the motion was that newly developed evidence might be offered which could not be presented in the former trial. It could have been presented in the trial if it had been developed at the proper time, that is, if the provisions of ''A'' originally had been followed. The failure to follow the provisions of ''A'' was not an inadvertent omission, but was a deliberate act based on legal advice.

For the purpose of submitting such contention, defendants assume that the action is one for declaratory relief and that in such action all phases of the controversy must be disposed of so that the judgment will be complete and final. Assuming, as the motion for new trial shows, that defendants purported to proceed under ''A'' after the trial court had directed that

findings should be prepared upholding plaintiffs' main contentions and that defendants' action was an admission that, technically, defendants had not complied with "A" but desired to proceed in accordance with it, a ratification by referendum in effect was an attempt by amendment to substitute the whole of "B" for "A." This occurred approximately two years and a half after the convention. Such a substitution at that late date would not return to the association the donations, legislative or otherwise, of funds taken from the treasury of the association. However, an approval of these expenditures is shown in the motion for new trial, but it is a blanket approval of expenditures, contracts and "all other matters," as shown in the affidavit of the president. The ratification of the "invalid" expenditures would result in establishing a practice and initiating a precedent that the general council could expend and subsequently ask for approval from the membership. The distinction between "A" and "B" in this respect is that "B" authorizes the council to expend and then to ask the membership approval, while "A" requires approval of the membership before expenditure.

The judgment in this proceeding was filed before the termination of the proposed referendum to amend "A." The trial court could not be aware of the result of any proposed referendum. A motion to reopen after trial and before entry of judgment is a matter that rests in the discretion of the trial judge. (24 Cal.Jur. 768.) This court is unable to say that there was an abuse of such discretionary power in denying the motion to reopen the case for the introduction of evidence, not new, but developed since the trial, which could have been developed before the trial. ▮▮▮ For the same reason the motion for new trial was denied. It was not newly discovered evidence as that term is used in Code of Civil Procedure, section 657.

▮▮▮ When a common fund is maintained for the benefit of a number of persons bound together by association and a contract exists between the association and its members directing the course of action in changing the personal and property rights of the members, and an effort is made to break the contract and substitute another which impairs and injures the rights of the beneficiaries, then the successful maintenance by a few for the benefit of many of an equitable action resulting in the protection of the contractual rights as originally established is ground for allowing attorney's fees to those who battle to redress the wrong and maintain the previous

personal rights although no actual court order to return the erroneously spent funds has been made. The record discloses that benefits have been bestowed upon those who would have suffered loss but for the appearance of the plaintiffs in this case. Attorney's fees should be paid plaintiffs' attorneys. *Winslow* v. *Harold G. Ferguson Corp.*, 25 Cal.2d 274 [153 P.2d 714].) The amount of such fees is left for the determination of the trial judge. (*Adams* v. *California Mut. B. & L. Assn.*, 18 Cal.2d 487 [116 P.2d 75].)

The appeal from the order denying the motion for a new trial is dismissed. The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied September 14, 1949, and appellants' petition for a hearing by the Supreme Court was denied October 13, 1949.